UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 1:20-cr-00194 JLT |
|---|---|
| Plaintiff, | ORDER DENYING MOTION TO SUPPRESS (Doc. 57) |
| v. | |
| REYES DIAZ, | |
| Defendant. | |

Reyes Diaz moves the Court to suppress all evidence discovered on October 13, 2020 at an apartment on Peralta Way, after his vehicle was stopped by police. Mr. Diaz contends that because the officer had no legal grounds for stopping him and failed to have probable cause to believe that the apartment searched belonged to him, the evidence should be suppressed. The Court disagrees. Thus, the motion is **DENIED**.

I.   **Background**

In the week before October 13, 2020, MAGEC Officer, Anthony Vallez, was conducting "probation parole checks" at the apartment complex located at 2434 Peralta Way in Fresno, California, which included surveillance of the complex0

. (Doc. 58-1 at 3; Doc. 58-2 at 2) In connection with this surveillance, Vallez discovered that Reyes Diaz lived at the complex and that he was on active CDCR parole and was subject to search of his person and property. (Doc. 58-1 at 3; Doc. 58-2 at 2) During the week before the search, Vallez drove

by the complex periodically and saw Diaz's vehicle parked in front of the complex many times and many times saw Diaz on the second floor of the complex entering and leaving an apartment. *Id*. Due to Vallez's vantage point, he was not certain which of the two upstairs apartments Diaz entered, though he believed it was apartment 203. (Doc. 58-2 at 2)

On October 13, 2020, Vallez saw Diaz on the second floor of the complex, who then went downstairs and got into his car. (Doc. 58-1 at 3) Vallez followed Diaz. *Id*. During this time, Vallez saw that there was a paper license plate affixed over the metal plate on the back of the car. *Id*. As Diaz drove, Vallez asserts that the paper plate, which was attached only at the top, flapped in the wind. *Id*. This made it impossible to read either the paper license plate or the metal plate underneath. *Id*. Vallez stopped Diaz, who identified himself and reported that he was on parole. *Id*.

On the bodycam footage, Vallez asked Diaz for his license and registration. Initially, Diaz provided an expired registration. However, from this documentation, Vallez asked dispatch to run the plates—not the number on the paper plate but the number on the permanent metal plate 7YEY572[1]. Dispatch confirmed that the number on the permanent metal plate, which was associated with the Blue Hyundai, was registered and the registration was current.

Vallez asked Diaz for his address and Diaz provided an address on Hedges Street. (Doc. 58-1 at 3; Doc. 58-2 at 3) When Vallez asked him whether he lived at the Peralta Way address, Diaz denied this and claimed that was where his babysitter lived. (Doc. 58-1 at 3) Though Diaz reported that he was staying at the babysitter's apartment on Peralta Way, when Vallez asked Diaz for his babysitter's name, Diaz said that he did not know it. *Id*. Diaz said that he was in the process of moving, to explain why his car was so messy. *Id*. Diaz said that the only person present at the babysitter's apartment was a friend, "Tony." *Id*.

Vallez returned to the Peralta Way address and first went to apartment 202. (Doc. 58-2 at 3) He spoke to the resident. Vallez said to the man, "This ain't Reyes' house, is it?" When the resident confirmed that it was not Reyes' house, Vallez asked if "the Mexican dude" lived next door. *Id*. at 3-4. A man named Antonio Rico answered the door. *Id*. at 4. Mr. Rico denied that he lived there and said

---

[1] On the bodycam footage, Vallez asks dispatch to run, "Seven, Yellow, Edward, Tom, Five, Seven Two." The paper plate displayed, "AU65H96."

he had spent the night there but was planning to go home. *Id*. He denied he was Reyes' babysitter and confirmed that Reyes and Reyes' children lived in the apartment. *Id*.

## II.     The vehicle stop

California Vehicle Code section 5201 provides in pertinent part:

> (a) License plates, including temporary license plates, shall at all times be securely fastened to the vehicle for which they are issued so as to prevent the plates from swinging, shall be mounted in a position so as to be clearly visible, and so that the characters are upright and display from left to right, and shall be maintained in a condition so as to be clearly legible . . .
>
> [¶¶]
>
> (b) Temporary license plates shall be replaced with permanent license plates upon receipt of the permanent license plates, and the temporary license plates shall be destroyed at that time.

Thus, the relevant section of section 5201(a) requires a driver to do three things: to have the license plate securely fastened to the vehicle to prevent it from swinging, to have it mounted so that the characters on the plate are clearly visible and may be read from left to right, and to maintain the plate so that it is legible. Section 5201(b) requires the driver to display the permanent plate once received and to discard the temporary plate at that time. Consistent with this, California Vehicle Code section 5202 allows a temporary plate to be use *only* "until the temporary license plate or the special permit expires, or the permanent license plates are received, whichever occurs first."

For a vehicle stop to be lawful, the Fourth Amendment requires only, based upon the facts known to him, that the officer form a reasonable suspicion that criminal activity is occurring, and perform the stop in a manner that is not objectively unreasonable. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Lopez–Soto,* 205 F.3d 1101, 1105 (9th Cir. 2000). The fact that the officer is mistaken as to a fact or the law, is not alone sufficient to demonstrate that the traffic stop was unlawful.[2] *See Khachatourian v. Hacienda La Puente Unified Sch. Dist*., 2012 WL 12877986, at *12-*13 (C.D. Cal. 2012), aff'd, 572 F. App'x 2014) (holding that officer had probable cause to arrest teacher for possessing a firearm on school grounds even though the charge was ultimately dismissed

---

[2] Likewise, the officer's subjective motivation for making the traffic stop is irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996); *Devenpeck v. Alford*, 543 U.S. 146, 154, 155 (2004) ["Subjective intent of the arresting officer. . . is simply no basis for invalidating an arrest."]

because an exception applied).

Mr. Diaz argues that the stop was unlawful because the paper plate was firmly affixed, as shown by the amount of force needed for Vallez to remove it, and because the bodycam footage does "not evidence" that the temporary paper plate was flapping in the wind or was unreadable. (Doc. 59 at 1-2) The Court agrees that the body-worn camera footage shows that that the temporary plate was attached firmly in two places along the upper edge of the plate. However, it was not secured at the bottom edge of the plate. Though there is no video footage[3] of the plate while the car was moving, the footage *does* show the condition of the paper plate after the car had stopped. (*See also* Doc. 64 at 5) The paper plate is bent/curled upward, and the left side is bent/curled toward the right. This damage corroborates Vallez's account that the plate was flapping in the wind[4].

In addition, it is apparent from the camera footage that there is a permanent, metal license plate underneath, though the license plate number is obscured by the paper plate. Because the evidence is sufficient that the paper plate was not secured in a way to prevent it from flapping and causing the numbers to be unreadable and because Mr. Diaz's car had both a temporary paper plate and a permanent metal plate, there was sufficient lawful reason for Officer Vallez to perform a vehicle stop. Upon these facts, the Court finds the officer had reasonable suspicion to stop the car. Consequently, the on this basis, the motion is **DENIED**.

**II.    The apartment search**

The parties agree that Officer Vallez needed to have probable cause to believe that Mr. Diaz lived at the Peralta Way address before he could search it. The Court concludes that Vallez had probable cause. First, Vallez saw Diaz at the apartment "multiple" times and saw Diaz's blue Hyundai "multiple" times, in the week before the traffic stop[5]. (Doc. 58-2 at 2) On these occasions, Vallez saw Diaz entering and exiting the second floor of the complex and, one time, saw him carrying out, what

---

[3] This is due to the interference with the camera's view caused by the patrol car's steering wheel and hood.

[4] There may be some explanation for the condition of the paper plate other than the wind, but Mr. Diaz does not suggest what that may be. Indeed, he does not even mention the condition of the plate.

[5] The Court is unsure why Diaz contends that Vallez saw him at the Peralta Way address only on two occasions. (Doc. 57 at 6)

appeared to be, a bag of trash. (Docs. 58-2 at 2; Doc. 63-1 at 2) Vallez also saw him entering and exiting the blue Hyundai while it was parked at the Peralta Way apartment. (Doc. 63-2 at 3)

Second, though Diaz denied he lived at the Peralta Way address and claimed it was his babysitter's address, the Court agrees that Vallez was entitled to consider the fact that Diaz did not know the name of his babysitter—with whom he also claimed to be staying (Doc. 58-1 at 3)—when evaluating whether Diaz's claim to live elsewhere was credible[6].

Third, though the evidence shows that Vallez had formed the opinion that Diaz lived at apartment 203, he went first to apartment 202, to ensure that he was not mistaken. The resident of apartment 202 denied that "Reyes" lived there and confirmed that "the Mexican dude," lived next door. Because there were only two apartments upstairs, this process-of-elimination was a reasonable investigatory method for Vallez to take to further confirm Vallez lived at apartment 203.

Fourth, Diaz reported his friend, "Tony" was at the Peralta Avenue address at the time of the traffic stop and, indeed, Tony *was* there[7]. After knocking on the door of apartment 203, Tony Rico, who was clearly confused by the police presence, opened the door and reported to Vallez that he did not live there, that he was not Reyes' babysitter and confirmed that Reyes and Reyes' kids *did* live

---

[6] The Court agrees that it was against Mr. Diaz's penal interest to report living at an unreported address. *United States v. Howard*, 447 F.3d 1257, 1266 (9th Cir. 2006). On the other hand, the Court does not find it significant that Vallez did not contact Diaz's parole officer. There is no obligation for a police officer to do this. Moreover, the evidence contradicts Mr. Diaz's claim that contacting the parole agent would have confirmed that Diaz lived at the Hedges Avenue address. The parole records demonstrate that Diaz reported to his parole agent that he lived at the Hedges address nine years prior and had reported four addresses since that time. (Doc. 63 at 2) Moreover, Mr. Diaz filed an email in which Special Agent Ernie Muro, of the Office of Correctional Safety, Central Valley Fugitive Apprehension Team, reported, "On 10-13-20, I confirmed with Parole Agent Adams, on 09-28-20, a home visit was completed with Diaz, pursuant to State of Emergency Covid-19, Stage 2 Action Plan. At this time, Diaz reported a change of address to Parole agent Diaz of 2434 E. Peralta Way #203 in Fresno, CA. On 10-13-20 Diaz was placed into custody." (Doc. 64 at 1)
  Despite how it sounded when this was read aloud at the hearing, in reviewing the document, it appears that the email confirms that Mr. Diaz reported to Parole Agent Adams, when he made the "virtual" home visit on September 28, 2020, that Diaz lived at the Peralta Way apartment. It appears also that when Special Agent Muro refers to Parole Agent "Diaz," he made a typo and was, in fact, referring to "Adams." In any event, because the Court is concerned as to whether Officer Vallez had probable cause to believe that Diaz lived at the Peralta Way apartment, and he had not spoken with the Parole Agent, the Muro email does not bear on the Court's analysis.

[7] Diaz suggests that Tony is not credible because, apparently, he was at the apartment when the drugs were discovered there by the police. However, there is no evidence to contradict that Tony was only an overnight guest. And, of course, if the presence of the drugs at the apartment is a reason for Tony to lie, this provides the same reason for Diaz to lie, because he was seen by Vallez to have left the apartment just minutes before, and Diaz does not dispute that he spent the night before at the Peralta Way apartment.

there. All of this occurred before Vallez entered the apartment and searched. Based upon all of this evidence, the Court finds that Officer Vallez had probable cause to believe that Mr. Diaz lived at the Peralta Way apartment. Thus, the motion to suppress is **DENIED**.

### III. No evidentiary hearing is warranted

"An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (citing *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986); *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990); *United States v. Irwin*, 612 F.2d 1182, 1187 n.14 (9th Cir. 1980); *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972)). "[T]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a desire to cross-examine." *United States v. Marcello*, 731 F.2d 1354, 1358 (9th Cir. 1984); *United States v. Woodson*, No. CR 11-00531 WHA, 2011 WL 5884913, at *6 (N.D. Cal. Nov. 23, 2011) (denying a defense request for an evidentiary hearing because "mere refusal to accept the uncontradicted evidence does not create a material issue of fact"); *United States v. Walker*, 239 F. Supp. 3d 738, 739 (S.D.N.Y. 2017) ("While [an evidentiary hearing] might have been warranted if there were important credibility issues that could not be addressed from the paper record, the defendant has made no showing that that is the case here."); *United States v. Martinez*, 992 F. Supp. 2d 322, 325–26 (S.D.N.Y. 2014) ("A defendant is not entitled to an evidentiary hearing in connection with a motion to suppress unless he can show that there are 'contested issues of fact going to the validity of the search'" and in the absence of an affidavit "by someone with personal knowledge that disputed facts exist" an evidentiary hearing is unnecessary) (citations omitted).

Despite contending that there are factual disputes, Mr. Diaz doesn't contradict the salient facts. Instead, he offers actions the officer *could* have taken or conclusions[8] that the officer *could* have come

---

[8] For example, the Court disagrees that "all observations of Reyes Diaz were "totally consistent with innocent conduct." (Doc. 62 at 3). As noted above, it is unreasonable and inconsistent with innocent conduct—and inconsistent with a parent's legal obligation to his children—to not know the name of the babysitter with whom the parent was leaving his kids. It is unreasonable and inconsistent with innocent conduct to not know the name of the person with whom he had been staying.

to without addressing, head-on, the evidence as presented by the government. (Doc. 62 at 2-3) Likewise, he identifies a series of "disputed facts" (despite that some of those listed are disputes of law) and he finds other fault with Vallez's report without detailing how these alleged insufficiencies bear on the issues. *Id.* The Court disagrees that these claims would justify an evidentiary hearing.

On the other hand, at the hearing, Mr. Diaz's attorney indicated that there were, in fact, on;y two factual issues Mr. Diaz wanted to establish at an evidentiary hearing: that Vallez never contacted Mr. Diaz's parole officer and what was contained in the Muro email. However, there is no dispute that Vallez did not contacted the parole officer and the Court accepts the contents of the Muro email but finds it is not helpful. First, though Parole Agent Adams would say that he had a contact with Diaz on September 28, 2020, there is no dispute that the contact was not in person. Second, the information about when Diaz reported that his address was on Peralta Way was not known to Vallez and could not have formed the basis for him believing that Diaz lived there. Thus, no hearing is required as to these topics. Finally, the fact that Diaz wants to cross-examine the officer in hopes of gathering helpful evidence is, as demonstrated by the authorities cited above, insufficient to justify an evidentiary hearing. Thus, the request for an evidentiary hearing is **DENIED**,

**ORDER**

Based upon the foregoing the Court **ORDERS**:

1. The motion to suppress is **DENIED**.
2. The Court sets a further status conference on August 14, 2023 at 10:00 a.m.[9]

IT IS SO ORDERED.

Dated:   **August 8, 2023**

UNITED STATES DISTRICT JUDGE

---

On the other hand, Diaz fails to explain why he thinks it is significant that Vallez did not note in his report where 2231 E. Hedges was located in relation to where the traffic stop occurred. He does not contend that he was leaving from the Hedges Avenue apartment on the day of the traffic stop and, of course, the location of the stop was much closer to the Peralta Way apartment than the Hedges apartment. Fed. R. Evid. 201(b)(2).

[9] The parties may stipulate, with an adequate time exclusion, to a different status conference date before Judge Oberto.